Filed 3/3/15  P. v. Torres CA4/1

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TYLER TORRES,<br><br>    Defendant and Appellant. | D063150<br><br><br>(Super. Ct. No. SCD238344) |

APPEAL from a judgment of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Steven J. Carroll, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Tyler Torres of two counts of assault by means of force likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(1); counts 1, 2); two counts of trying to prevent or deter an executive officer from performing a lawful duty by violence or threat of violence (§ 69; counts 3, 4); and battery upon a peace officer (§ 243, subd. (b); count 5). The jury found true Torres personally inflicted great bodily harm on an individual in violation of section 12022.7, subdivision (a) as to counts 1 and 2. The court sentenced Torres to prison for nine years four months.

Torres appeals, contending the trial court abused its discretion in denying his three *Marsden*[2] motions. He also argues the court erred in denying his motion for acquittal on count 3 under section 1118.1. Torres further maintains the court abused its discretion when it denied his request for probation and referral to Veterans Treatment Court (Veterans Court) under section 1170.9. Finally, Torres asserts that this court must examine certain materials reviewed by the trial court in camera to determine if the trial court abused its discretion in denying discovery after considering Torres's *Pitchess*[3] motion.

We have reviewed the subject materials and determine that the trial court did not abuse its discretion in denying Torres discovery per his *Pitchess* motion. In addition, we

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

[2]     *People v. Marsden* (1970) 2 Cal.3d 118.

[3]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

conclude none of the other issues Torres raises here have merit. As such, we affirm the judgment.

FACTUAL BACKGROUND

Prosecution

During the early morning hours of April 24, 2011, Derrick Young, an officer with the San Diego Police Department (SDPD), was patrolling Garnet Avenue in a marked patrol van and in full uniform. Around 1:30 a.m. to 2:00 a.m. that morning, Young and his partner, Officer Nicholas Minx, who also was in full uniform, were at the corner of Garnet and Everts performing a traffic stop. Three people contacted them and said a man was riding his bicycle on Garnet, challenging people to a fight and kicking them. As Torres rode a bicycle on Garnet toward Young and Minx, one of the people identified Torres as the man in question. Young stepped in front of Torres's path and ordered him to stop because he needed to talk to him. Torres, who appeared very angry, continued riding, looked right at Young, and said, "Fuck you." Young stepped to the side, and, as Torres continued to ride, used his right hand to grab Torres by the left arm. Torres got off balance and stopped the bike with one leg straddling either side of it. Torres looked at Young and said, "Fuck you, now it's on." Torres, who appeared to be drunk and smelled of alcohol, attempted to pull his left arm from Young's grip while trying to punch Young with his right hand. The punch missed and Young unsuccessfully attempted to put Torres in a department-approved carotid restraint. Minx came over to assist Young and all three of them fell to the ground.

Young and Minx ordered Torres multiple times to roll over on his stomach and put his hands behind his back. He refused and resisted by flailing his arms and legs. Minx used his radio to call for back up because Torres was resisting and a crowd was forming. Young and Minx forced Torres onto his stomach. Sergeant Patrick Vinson, who was in full uniform, arrived in a marked police van as Young and Minx managed to handcuff Torres. Young and Minx carried Torres to the police van as he continued to resist by kicking and wiggling. Vinson opened the back doors of the police van and Torres told Vinson, "Sergeant, you're a punk." As Young and Minx lifted Torres to put him into the van, Torres put both feet on the rear bumper and pushed his weight back at Young and Minx. Torres taunted them by saying, "Fuck you. I'm not going in there. You're going to have to work harder to get me in there. Come on. Use your strength." Young, Minx, and Vinson put Torres on the ground and called for more units to cover them given Torres's continued resistance and the very large crowd that had formed around them. While Torres was on the ground, Torres kicked Vinson several times, including a kick with both feet to Vinson's chest that caused him to fly back a couple of feet. Finally, they got Torres into the van. The entire incident lasted about eight minutes.

Nearly eight months later, 61-year-old Hikmat Daoud was on duty as a security officer, in full uniform, at the Bay Point Apartments located at 3866 Ingraham Street in San Diego. Around 10:45 p.m. that night (December 15, 2011), Daoud received a noise complaint from a first floor tenant in building 14. Daoud walked toward building 14 and heard very loud music coming from apartment 206, which was Torres's studio apartment.

4

As Daoud was walking, he saw Torres drinking beer on his balcony, but it did not appear that Torres saw him. Daoud walked up the staircase to the second floor. As Daoud approached Torres's apartment, he saw Torres grab a bike with a small motor that was near his apartment door and take it inside his apartment. Daoud believed Torres saw him and ignored him.

When Daoud arrived at the door to Torres's apartment, the music was still very loud. Daoud knocked on the door and there was no response. Daoud assumed Torres could not hear him knocking based on the loudness of the music, so he used his torque light to knock on the door. From the other side of the door, Daoud heard Torres say, "Who the fuck is it?" Daoud said he was security doing his job, that he had received a complaint about his loud music, and asked Torres to turn his music down. Torres responded, "Get the fuck out from my door. This is my apartment. I can do whatever I want." Daoud responded that Torres did not have to open the door, but that he needed to lower the volume of the music. Daoud did not hear the music being lowered or any response. Torres opened the door and told Daoud to "get the fuck from here." Daoud said that he was going to call the police department. Torres responded, "Fuck you and the police" and closed his door.

Daoud stepped back from the door and called the police. During the call, Daoud described Torres as a "very drunk" big man who was over six feet tall, heavy, in his 20s, with a shaved head. The dispatcher asked Daoud to stay on the line and ask the resident nicely to lower the music while letting him know Daoud was speaking to the police.

5

Daoud knocked on the door. Torres said through the door, "You again, motherfucker, security?" Daoud told Torres he was on the phone with the police, they could hear everything, and Torres had to turn down the music or the police would be coming. Torres opened the door and his unleashed dog jumped at Daoud. Torres grabbed the dog by the tail, threw it inside the apartment, and told Daoud to get away. By the time the call to the police concluded, Torres had gone back inside his apartment. Daoud walked to Grand Avenue and waited for the police.

SDPD Officers Donald Meeks and Francis Minton, who were both in full uniform and had received radio calls about a noise disturbance at the apartments, arrived in separate marked police cars soon after receiving notice of the disturbance. Daoud led Meeks and Minton to the second floor hallway of building 14 and they had Daoud wait in the hallway as they approached Torres's apartment door. The music coming from Torres's apartment was still very loud. Minton approached the door. Meeks stood beside her. Minton covered the peephole and knocked on the door with her hand and got no response. She then knocked on the door with her flashlight. Torres opened the door. Torres had both of his fists clenched, appeared angry, and had a smirk on his face. Minton was extremely friendly and told Torres there had been a noise complaint and he just needed to turn the music down. At that point, Torres's black dog, a Rottweiler mix, starting walking toward Minton's feet. Minton told Torres his dog was getting out and Meeks told Torres to "get ahold" of his dog. Torres grabbed the dog by the tail with his right hand, picked it up, and threw it against the wall behind him inside the apartment.

6

Minton, extremely shocked, yelled at Torres, "Oh my gosh, what are you doing." Torres said, several times, "You want some, get some."

Meeks stepped in between the 5'8" and 124 pound Minton and Torres, who was much larger than her at 6'2" and 260 pounds. Torres began closing his door, but Meeks told Torres he was under arrest (for the felony of abusing his dog) and used his left shoulder to block Torres from closing the door. Both Meeks and Torres pushed against the door until Torres let go and Meeks stumbled forward. As Meeks stumbled forward, Torres landed a "sucker punch" to Meeks's nose that caused it to bleed profusely. Meeks went down and Torres used both hands to throw a flurry of eight to 15 punches to Meeks's head.

Minton began punching Torres and used her lapel microphone to call out "cover now" for the immediate assistance from other officers. Torres knocked Minton to the ground with a punch to her head and punched her several more times when she was down, rendering her briefly unconscious.

Meeks attempted to get up, but stumbled over the prone Minton and fell against the door of another apartment across the hallway. Torres dove out of his apartment and resumed punching Meeks. Meeks pushed Torres off of him, stood up, and began trading punches with him as Minton regained her senses and stood up. Minton deployed her taser to Torres's midsection and used her baton to strike Torres several times in his upper torso, but neither had any effect. Minton's taser was knocked to the ground. Meeks deployed his taser and struck Torres in his chest with both prongs "in full arc," but Torres

7

pulled off the prongs. Torres appeared to see Minton's taser on the ground. Meeks told Torres to not "even think about" picking up Minton's taser, and Meeks and Minton drew their guns. Torres stepped back into his apartment and slammed the door shut.

The resident of a neighboring apartment gave Meeks a towel to staunch the profuse blood flow from his nose. Minton told Daoud she had radioed for help and asked him to go to the front of the complex on Ingraham Street to show arriving officers where the apartment was located. Daoud walked to the front of the complex and many officers and an ambulance arrived. The ambulance took Meeks and Minton to the emergency room at Scripps Memorial Hospital.

At 10:58 p.m. that same night, Daniel Neifer, a SDPD officer in full uniform who was on patrol, responded to Minton's "cover now" radio call. Neifer and Officer Fish responded to the apartment a couple of minutes later. Meeks had been moved away, Minton appeared "frazzled," and Torres's apartment door was shut. SWAT was called out and Neifer and Fish were designated to arrest Torres after SWAT finished its mission. The SWAT team came out and spoke to Torres from the ground level in the courtyard area. Torres stood on his balcony with a bottle of beer in one hand, and a big knife in the other hand. Torres swore at them, threatened to injure them as he had the other officers, and dropped the knife from the balcony. After just under two hours, the SWAT team of four to five officers made entry into Torres's apartment and took custody of him. Once the SWAT officers had Torres outside, Torres resisted their attempt to put him into handcuffs.

The SWAT officers passed Torres over to Neifer and a SDPD officer named Neilson in the hallway. Neilson was involved because Fish could not get around to Torres's other side. Torres refused to move as directed, and physically pulled away and resisted when Neifer tried to pull him. Neifer and Neilson applied an arm bar and Torres moved down the stairs. When they got Torres to a police car, he refused to get into it. It took the two officers pushing Torres and another officer pulling him from the other side to get him into the police car.

On the drive to police headquarters, with Fish driving and Neifer in the passenger seat, Torres told Neifer, "You better hope I don't see you in your uniform or you'll be sorry. I'm at a point where I don't give a shit about anything anymore."

Lloyd Sentinella, the lead investigator for the SDPD, gave Torres his *Miranda* rights at police headquarters while Torres was in the police car. After Torres, who appeared to have been drinking alcohol, waived his rights, Sentinella questioned him. Torres said that after he had come home that night, he drank six beers and smoked some marijuana. He said the officers were just at the wrong place at the wrong time because they prevented Torres from trying to relax. Torres also said, however, that the officers had "swung" at his dog and he was not going to let that happen and "it was on" at that point. Torres admitted to punching both officers, but said the entire fight was inside his apartment and not in the hallway. Torres said he was tasered twice, but it did not have any effect. Torres said that the incident ended when he closed the door on both officers. Torres denied ever having a knife.

9

Meeks suffered multiple fractures to his nose, a fractured septum, two chipped teeth and a broken finger. He needed surgery and other medical intervention, missed three months of work, and continued to have memory problems. Minton suffered contusions to the right side of her head and neck, a mild concussion, and a cracked molar that may have caused "cracked tooth syndrome." Minton needed dental intervention of $3,600, missed 30 days of work, and had many lingering effects from the beating.

Defense

Torres testified that he had a bachelor's degree in business and a master's in accounting and he worked for the United States Navy as a civilian. As to April 24, 2011, Torres said that around 1:00 a.m., after drinking two beers over three hours at a bar, he rode his bicycle to go home. A person, who said nothing to Torres, grabbed him and made him lose balance and straddle his bike. Torres said, "What the fuck are you doing?" He then realized it was a police officer after seeing his badge. The officer (Young), said "I want to talk to you," and Torres responded, "You don't have to grab me." Young did not respond and Torres asked him twice to remove his hand, but he did not do so. Torres pulled away from Young and another officer, Minx, came over as Young put Torres in a chokehold. They all then fell to the ground and Torres hit his head. Torres claimed he did not remember anything else until he asked that his handcuffs be loosened near the county jail.

As to the apartment confrontation, Torres testified he received notification that afternoon he got a new position working for the U.S. Department of State auditing local

10

government agencies. Torres went home and took his dog, Odie, to puppy beach in Pacific Beach. He then went to the liquor store and got a six pack of beer to celebrate his new position. Torres got home, drank a beer, and began preparing a meal. He left his apartment at 10:00 p.m. and left his music on, bought another six pack from a liquor store half a block away, and returned to his apartment. The security guard was at Torres's door when he returned. Torres told the security guard to get out of his way, went into his apartment, and shut the door.

Torres said that when he opened the door to the security guard and the police, the police told him they were there on a noise complaint. Odie tried to run out, he grabbed Odie by the tail, and the dog went under the bed. Torres denied throwing the dog. Torres then attempted to shut the door. Minton blocked the door and Meeks kicked the door open, said, "that's no way to treat your dog" and punched Torres in the face. Torres then, to defend himself, struggled with Meeks and Minton, including trading punches and Torres being shocked with a taser.

Torres communicated with the police from his balcony for about two hours before they entered and arrested him. He had a knife on the balcony because he had left it on the barbeque grill when he was cooking chicken.

On cross-examination and recross-examination, Torres said that when he left at 10:00 p.m., he did not buy more beer, he had approximately three beers left of the original six pack, and he bought ice cream. He smoked marijuana that night, inhaling a couple of times, and claimed to use it for medicinal purposes. Torres was relaxed, but

11

not "stoned." The officer started things first by coming into his apartment and punching him. His reaction was self-defense. He did not wish to hurt anyone. Torres claimed that post-traumatic stress disorder (PTSD) had an effect on his behavior after he was attacked by the officer. Torres also claimed that he did not recognize Minton and Meeks as officers during the initial contact or the struggle. He denied saying, "want some, get some." He did not realize they were officers until he saw Meeks's SDPD cap in his apartment. He punched Meeks in the face four times after feeling the effects of the taser and pushed Minton off his back. He was on his balcony for two hours and threw down Meeks's cap and a knife. While officers were attempting to talk to him on his balcony he went inside and "did the dishes." The police then hit Torres's balcony with a pepper spray ball.

On redirect examination, Torres testified that he experiences short term memory loss on occasion. Torres stated that although he does not have a medical marijuana card, he smokes marijuana because he has "post traumatic stress." Torres also testified that he told Sentinella that "they swung on me, dawg," using the slang term "dawg" instead of "dog."

Prosecution Rebuttal

Steven Woodrow, a long time SDPD officer, spoke with Torres while he was on the balcony at the request of Vinson. Six to eight officers and a sergeant were present when Woodrow arrived. Woodrow calmly spoke with Torres from the courtyard behind his apartment to try to have him surrender peacefully. Torres drank more than one beer

12

on the balcony.  At one point, Torres dropped a knife out of his waistband onto the ground.  No one was hit by the knife.  Torres went back and forth between the balcony and the inside of his apartment.  Torres vacillated between showing remorse by asking about Meeks's condition, and being angry and defiant to opening his door for the police. At one point, Torres said that if any officers came into his apartment, they would "meet my nine."  This led Woodrow to believe that Torres had a nine-millimeter gun in the apartment.

Vinson was the on scene supervisor on the night in question.  There were at least 10 officers there when Vinson arrived.  About 15 minutes before Torres was arrested, the emergency negotiations team spoke with Torres.  No taunts were directed at Torres. Pepper balls were deployed onto Torres's balcony to distract and disorient Torres to make it safer to arrest him.  A SWAT entry team of roughly seven officers and a K-9 used a key to enter the apartment, found Torres standing in the middle of the apartment, and ordered him to get down on the floor.  Torres did not get down and said "hostile" words. Officers struggled with Torres before putting him in custody.  Torres was arrested without a warrant based on the "exigent circumstance" of his violent behavior and his insinuations that he was armed.

A recording of a jail phone conversation between Torres and another person two days after the incident was played for the jury and later admitted into evidence.  During the recording, Torres, when describing what occurred at his apartment, never said that he was struck by the officers.

Defense Surrebuttal

Brian Goldberg, an SDPD lieutenant, gave an interview with a television station the night of the incident where he said Torres threw his dog at Meeks and Minton. Goldberg testified, however, there were between 20 to 40 officers at the location that night and he did not know where he got the information about Torres throwing his dog at Meeks and Minton. He did not recall specifically being told that information by Meeks and Minton.

Torres testified he was talking to his cousin in the jail interview recording. Torres said, as to apartment confrontation, his adrenaline was going (because of) "post-traumatic stress disorder." He also testified that, "with post-traumatic stress disorder, I'm going to defend myself." Again, in talking about the recording, Torres said his cousin said he needed to let the world know about PTSD.

## DISCUSSION

### I

### *TORRES'S MARSDEN MOTIONS*

Torres contends the superior court erred in denying his three *Marsden* motions. The People argue there were only two *Marsden* motions. However, this disagreement is immaterial as the People address all three instances where Torres questioned the effectiveness of his counsel: September 17, 2012; September 19, 2012; and November 2, 2012. For purposes of our review, we consider all three of these requests and find no error.

14

## A. Background

### 1. September 17, 2012

Before trial began on September 17, 2012, Torres made a *Marsden* motion and the prosecutor left the courtroom. Torres complained that he had not spoken to defense counsel, a deputy public defender, from the time she was assigned the case in May 2012, until August 17, 2012. He claimed his attorney had not returned Torres's numerous calls and e-mails to her. Torres said he met with defense counsel in her office on August 17, 2012. Torres stated that defense counsel had not reviewed the case thoroughly because she thought Torres had "sucker punched" the female officer. Torres also said they spent two hours discussing his case. During that two-hour discussion, they discussed evidence that Torres wanted introduced at trial and arranged for Torres to type his official statement on what happened the night of December 15, 2011. Torres said on Friday the following week he e-mailed his official statement to defense counsel and she said she would call Torres that day, but failed to do so. Torres said that on another occasion he called defense counsel and she said she would call Torres back the next day, but never did. On another occasion he called her and she said she would call back in 45 minutes, but failed to do so.

Torres said that over the next two weeks, he contacted defense counsel's supervisor, the county board of supervisors, a state representative, and federal congress members to try to get in contact with defense counsel. Torres claimed his efforts prompted a five-minute call from defense counsel in which she told Torres she had too

15

many cases, Torres's case was not the only one she had, and she was working on a Hell's Angel's case. Torres also said that defense counsel sent him an e-mail the Friday before the September 17, 2012 hearing about Torres's next door neighbor witnessing what happened through a peephole on December 15, 2011.

Torres further complained that he wanted defense counsel to subpoena Goldberg to testify about his media statement that Torres had thrown his dog at Meeks and Minton during the apartment altercation. Torres also wanted it introduced into evidence that Meeks attempted to adopt his dog after that night, and that his neighbor had made previous noise complaints about Torres.

Defense counsel stated that she was assigned the case on May 11, 2012, and Torres told her that day he wanted to take responsibility for what he did and go to Veterans Court, where a plea of guilty was required. Based on what Torres told her, defense counsel sent information to Veterans Court and assumed the case was being worked on there. She did not tell Torres she had too many cases, but did tell him that she had cases coming up before his. She also told Torres the Hell's Angel's case was not hers, but that case held her up the morning it was heard. Also, defense counsel learned from Torres at the readiness conference on July 23, 2012, that he did not want to enter a plea, and thus would not be in Veterans Court. That day, defense counsel told Torres to come to her office to discuss the case, but he told her he could not do so because he did not live in San Diego.

16

On the jury trial date, defense counsel asked for a one-month continuance. Defense counsel said she never told Torres he "sucker punched" a woman, but that it was claimed that Torres had punched Meeks. Defense counsel stated that she had a telephone conversation with Torres on September 6, 2012, and he told her he was satisfied with her representation. However, on September 10 or 11, Torres said he wanted a *Marsden* hearing.

Defense counsel said that the "biggest problem" was that Torres wanted to "run the case." He had sent messages to defense counsel on whom to subpoena, what questions to ask, and who and how she was supposed to cross-examine. Defense counsel had told Torres that he only had the right to decide whether to go to trial, and the right to decide whether he would testify, and that everything else was up to defense counsel. Defense counsel stated that she did not think the dog throwing evidence or the dog adoption evidence was relevant at trial, she had an investigator trying to interview the neighbor who witnessed Torres punch Meeks, she had reviewed all the relevant statements and evidence for trial, and she was ready for trial.

Torres disputed that he had spoken with defense counsel between May 11 and August 17, 2012, said defense counsel's attitude was to "blow [him] off," and confirmed he told defense counsel he wanted to go to Veterans Court and that she had Veterans Court contact him. Defense counsel also confirmed that Torres's opinion differed from defense counsel's as to relevance of the dog throwing and dog adoption evidence. Torres

17

said he had "lost faith" in defense counsel after she did not contact him following their meeting on August 17, 2012.

The trial court elicited from defense counsel that she was a very experienced defense attorney, having done approximately 120 trials over 23 years. The trial court told Torres that a public defender has a full caseload with many clients and would not always be able to call Torres back. The trial court also told Torres that defense counsel had in fact met with him for several hours, had e-mailed and called him, and was ready for trial. Torres and the trial court then further discussed the evidence he wanted admitted, and the court told Torres that if he wanted certain evidence to be known, he had the right to testify. The trial court denied the *Marsden* motion.

### 2. September 19, 2012

During trial, at the start of the morning session on September 19, 2012, there was a discussion in chambers outside the presence of the prosecutor. Torres repeated that he wanted Goldberg to testify about the accusation that Torres threw his dog at Meeks and Minton. Torres said he also wanted defense counsel to play videotapes of him being taken into custody on December 15, 2011, because it showed officers being aggressive with him. Defense counsel stated she did not want to play the videotapes for the jury because she did not think it was relevant and because it made Torres look aggressive and "sort of dangerous." Defense counsel further stated that it had already been established by Meeks's testimony that Torres did not throw his dog at Meeks and Minton, and defense counsel was certain Minton would testify the same. During further discussion,

18

the trial court indicated that Torres was arguing things that were within the strategic calls of defense counsel, defense counsel was correct in her assessment of the evidence, and Torres could choose to testify to tell his side of what happened.

Torres then resumed his complaint that his constant attempts to contact defense counsel went unanswered, and asked if the videotapes would be played if he represented himself. The trial court said it was too late for Torres to represent himself given that it was "midtrial." After further discussion, defense counsel noted to the trial court that Torres had made a motion to represent himself, and she had seen other cases where defendants had dismissed their attorney midtrial. Torres complained defense counsel did not want to represent him because she avoided, and refused to return, his phone calls.

The trial court noted that it had already been established that Torres met with defense counsel for several hours and there had been telephone contact. The trial court asked Torres if he was specifically requesting to represent himself. Torres responded, "No, Your Honor, because that would lead to a mistrial and the appeals process would be -- be ruined, you know. [¶] And I just want the videos represented. That's what I'm appealing." The trial court then asked defense counsel to reconsider the videotapes if in her view they corroborated Torres's statements that the officers used excessive force to apprehend him, and defense counsel agreed.

We note that during the September 19, 2012 in chambers discussion, Torres did not request that his appointed counsel be replaced. As such, the trial court never ruled on any *Marsden* motion on September 19.

19

### 3. *November 2, 2012*

On November 2, 2012, after the trial and before the date of sentencing, there was a hearing in the courtroom outside the presence of the prosecutor. Torres complained that defense counsel had failed to present the pretrial testimony of the officers and other witnesses. The trial court responded: "I don't know what you're talking about. I had the preliminary hearing transcript, sir. I reviewed all of that. . . . The witnesses were all impeached with any discrepancies in their preliminary statements. The jury had all that information. They listened to you testify for a very long period of time and heard your side of the story, sir, and they found you not credible, and they made a call on the case." The trial court pointed out that defense counsel argued vigorously to the jury that Torres was acting in self-defense. The trial court also said Torres could not change the facts that it was "clear as a bell" that Torres was a "man out of control" on that night who beat up two officers without provocation. The trial court further stated that given those facts, and the fact that Torres was pacing on a balcony with a knife and taunting the officers, it was an "uphill battle" for defense counsel. The trial court then noted Torres's agitation during the trial, and said, "I don't know what is making you tick, sir, but it's obviously some very serious issues."

Torres again expressed his frustration with defense counsel's performance, particularly with regard to discrepancies in testimony. The trial court repeated that defense counsel brought out any inconsistencies, including where the dog was located,

and vigorously argued self-defense to the jury.  Referring to defense counsel, the trial court stated, "based on what has been said, I don't find a basis to relieve her."

## B.  Law and Analysis

A trial court has broad discretion to grant or deny a motion.  When the court denies a *Marsden* motion, we review the denial under an abuse of discretion standard.  A denial is not an abuse of discretion unless the defendant shows the failure to replace the appointed attorney would "substantially impair" the defendant's right to competent counsel.  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.)  A trial court's discretionary decision will not be disturbed on appeal if there exists " 'a reasonable or even fairly debatable justification, under the law, for the action taken.' "  (*Gonzales v. Nork* (1978) 20 Cal.3d 500, 507.)  Consequently, we will interfere with the trial court's exercise of discretion only when we conclude that under all the circumstances, viewed most favorably in support of the trial court's action, no judge could have reasonably reached the challenged result.  (*Smith v. Smith* (1969) 1 Cal.App.3d 952, 958.)

Under the *Marsden* standard, a defendant must show that appointed counsel is not providing competent representation or that there is an irreconcilable conflict such that ineffective representation is likely to result.  (*People v. Dickey* (2005) 35 Cal.4th 884, 917.)  However, "a defendant does not have the right to the appointment of new counsel absent a clear showing of inadequate representation."  (*People v. Silva* (1988) 45 Cal.3d 604, 622.)  The trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance.  (*Marsden,*

*supra,* 2 Cal.3d 118, 124.) A trial court may not deny a request for substitution of attorneys without giving the defendant the opportunity to explain his reasons through presentation of argument and evidence. (*Ibid.*) "All *Marsden* held was that a defendant is denied a fair trial when the trial court refuses to hear enumerated specific examples of inadequate representation." (*People v. Huffman* (1977) 71 Cal.App.3d 63, 77.) When the defendant is afforded an opportunity to state the reasons for discharging an appointed attorney, the trial court's decision to allow a substitution of attorney is discretionary unless the defendant has shown that failure to order substitution is likely to result in constitutionally inadequate representation.

Here, the trial court was within its discretion in concluding that Torres did not make a showing sufficient to justify the discharge of his appointed counsel. On three occasions the trial court heard Torres's complaints about his appointed counsel.

Ultimately, the record reveals Torres was unhappy with his counsel for two reasons. First, Torres believed that his appointed counsel did not sufficiently communicate with him. Second, Torres disagreed with defense counsel regarding trial strategy. Neither contention shows the trial court abused its discretion in denying Torres's *Marsden* motions.

The record does show some communication gaps when Torres first received appointed counsel. However, this communication problem occurred because of a misunderstanding between Torres and his counsel. Torres confirmed that when he first met defense counsel in May 2012, he asked to be referred to Veterans Court. Therefore,

22

defense counsel sent information to Veterans Court, believing Torres was headed there. When defense counsel learned in July 2012 that Torres had changed his mind and was not going to Veterans Court, she acted quickly and appropriately to ensure Torres was adequately represented. She obtained a trial continuance and met with Torres on August 17, 2012. Torres acknowledged that on that date he discussed his case with defense counsel for two hours and that she arranged for him to type his official statement of what occurred on December 15, 2011. From that time until trial on September 17, 2012, defense counsel had an investigator try to interview the neighbor who saw Torres fighting with Meeks, and sent Torres an e-mail about that neighbor. Also, defense counsel stated that she spoke with Torres on the telephone on September 6, 2012, and he expressed satisfaction with her representation. Nevertheless, four or five days later, he requested a *Marsden* hearing. While Torres disputed what, if any, conversations took place between him and defense counsel from May 11 to August 17, 2012, Torres never denied that he spoke with defense counsel on September 6, 2012, and expressed satisfaction with her representation.

On this record, we cannot say the trial court abused its discretion in denying Torres's *Marsden* motions based on Torres's assertion that defense counsel failed to communicate regularly with him. Torres and defense counsel disagree regarding the number of times they spoke and the duration and content of those conversations. To the extent that the trial court made a credibility determination in believing defense counsel instead of Torres, we will not second guess the trial court in this matter. Simply put,

23

despite some communication issues, Torres has not shown that defense counsel was not providing competent representation or that there was an irreconcilable conflict such that ineffective representation was likely to result. (*People v. Dickey*, *supra,* 35 Cal.4th at p. 917.)

Likewise we are not persuaded that Torres has shown an irreconcilable conflict based on his complaints that defense counsel (1) refused to show the security video of him being taken from his apartment; (2) did not effectively cross-examine witnesses with inconsistencies between their trial testimony and preliminary hearing testimony; and (3) disagreed with him about calling Goldberg as a witness. As a threshold matter, we observe that all of Torres's concerns involve trial strategy. Disagreements over trial strategy do not " ' "constitute an 'irreconcilable conflict' " unless they portend a complete breakdown in the attorney-client relationship.' " (*People v. Clark* (2011) 52 Cal.4th 856, 912; see *People v. Freeman* (1994) 8 Cal.4th 450, 481 [defendant's distrust of counsel who suggested he plead guilty did not state an adequate basis for substitution of counsel].) Trial counsel is the person responsible for making all but a few of the tactical trial decisions. (*People v. Carpenter* (1997) 15 Cal.4th 312, 376.) The fact that the defendant does not wish to follow counsel's advice or chooses not to listen to counsel does not require the trial court to replace counsel. (*People v. Smith* (2003) 30 Cal.4th 581, 606; *Clark*, *supra*, 52 Cal.4th at p. 918.)

Here, Torres clearly is complaining about tactical decisions made by his trial counsel: what evidence to introduce, the cross-examination of witnesses, and which

24

witnesses to call at trial. Moreover, except for defense counsel's decision not to seek admission of the video of Torres being arrested, Torres's "complaint" about defense counsel's tactical decisions is without any support in the record. Torres has not pointed out, by citing to the record, how his trial counsel failed to cross-examine witnesses with discrepancies from the preliminary hearing. Also, the witness Torres wanted to testify (Goldberg) actually did. Again, on this record, Torres has not shown there was a complete breakdown in the attorney-client relationship resulting in an irreconcilable conflict.[4] (See *People v. Clark*, *supra*, 52 Cal.4th at p. 912; *People v. Crandell* (1988) 46 Cal.3d 833, 859-860.)

---

[4] To support his position that he was "embroiled in such an irreconcilable conflict" with his trial counsel that she had to be replaced, Torres insists he appeared "agitated" throughout trial. The only support in the record for Torres's claim is the comment by the trial court during the last *Marsden* hearing about Torres's "agitation throughout the whole trial." Torres has not cited to any other portion of the record indicating that he appeared agitated during trial or the jury noticed he was agitated during trial. We do not know if Torres appeared agitated to the jury or if he was agitated by his trial counsel's representation during trial. For example, during the sentencing hearing, Minton commented that Torres "smirked and smiled at me" while she was in court during Torres's trial. Without support in the record, we do not consider Torres's alleged agitation during trial as support for his claim that he was experiencing such an irreconcilable conflict with his counsel that ineffective representation resulted. (Cf. *People v. Neilson* (2007) 154 Cal.App.4th 1529, 1534 ["The appellant has the burden of furnishing an appellate court with a record sufficient to consider the issues on appeal. [Citation.] An appellate court's review is limited to consideration of the matters contained in the appellate record."].)

## II

### *TORRES'S MOTION FOR JUDGMENT OF ACQUITTAL*

Torres contends the trial court erred when it denied his motion for judgment of acquittal on count 3.  We disagree.

### A.  Background

In count 3 of the information, the prosecution alleged that on December 15, 2011, Torres:

> "[Did] unlawfully attempt by means of threats and violence to deter
> and prevent . . . an executive officer from performing a duty imposed
> upon such officer by law, and did knowingly resist by the use of
> force and violence said executive officer in the performance of
> his/her duty, in violation of PENAL CODE SECTION 69.  (to wit:
> San Diego Police Department Officer Daniel Neifer.)

At the close of the prosecution's case-in-chief, defense counsel moved, under section 1118.1, for judgment of acquittal on count 3.  Defense counsel argued that there was insufficient evidence that Torres resisted Neifer by using force or violence because Torres was mostly passive resistant by "wiggling around a lot."

The prosecutor countered that there was sufficient evidence because Torres's jostling back and forth made the officers have to use an arm bar to compel him forward.  The prosecutor also said Torres resisted being put into the police car and threatened Neifer on the way to the police station.  After further discussion between defense counsel and the trial court, the trial court agreed that the threat in the police car was not sufficient alone because it did not prevent Neifer from performing his duty.  The court also commented, "it's not the strongest case on a PC 69 that I've seen."

26

The trial court said that when looking at all of the evidence in a light most favorable to the People of what occurred for the hour and 45 minutes after Torres beat Minton and Meeks bloody, there was sufficient evidence to support count 3. This evidence included Torres yelling profanity at and taunting the officers while refusing to come down off his balcony, the deployment of the SWAT team, it taking five men to get Torres into handcuffs, the arm bar that had to be used on Torres, and the difficulty getting him into the police car. The prosecutor added that Daoud saw Torres with a large knife on the balcony at the time Torres was taunting the officers and Torres threw that knife below his balcony. The prosecutor reasoned that this evidence would be more than sufficient to show an implied threat under section 69. The trial court found that evidence would "also add to the threats and violence" and denied the motion for judgment of acquittal.

## B. Law and Analysis

" 'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." ' [Citation.] 'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.' [Citations.] The question 'is simply whether the prosecution has presented

27

sufficient evidence to present the matter to the jury for its determination.' [Citation.] The sufficiency of the evidence is tested at the point the motion is made. [Citations.] The question is one of law, subject to independent review." (*People v. Stevens* (2007) 41 Cal.4th 182, 200.)

We review the denial of a motion for acquittal pursuant to section 1118.1 under the substantial evidence standard. (*People v. Cole* (2004) 33 Cal.4th 1158, 1213.) Under this standard, we review the record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Story* (2009) 45 Cal.4th 1282, 1296.)

Here, count 3 concerned a charge against Torres under section 69. That section sets forth two separate ways in which an offense can be committed. The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law. The second is resisting by force or violence an officer in the performance of his or her duty. (*In re Manuel G.* (1997) 16 Cal.4th 805, 814; *People v. Rasmussen* (2010) 189 Cal.App.4th 1411, 1417-1418 (*Rasmussen*).)

The two types of offenses have different elements. (*Rasmussen*, *supra*, 189 Ca1.App.4th at p. 1418.) The first type of offense under section 69 requires specific intent to interfere with an executive officer's performance of his or her duties. (*People v. Nishi* (2012) 207 Cal.App.4th 954, 967; *Rasmussen*, *supra*, at p. 1420.) It can be established by a threat without any physical force. (*In re Manuel G.*, *supra*, 16 Cal.4th at

28

p. 814; *Rasmussen*, *supra*, at p. 1418.) It is not required that a threat be personally communicated to the victim by the person who makes the threat, the inference may be drawn from evidence that the defendant intended, and expected or at least foresaw, that the threat would be conveyed to the intended law enforcement targets of the threat. (*People v. Hamilton* (2009) 45 Ca1.4th 863, 936; *Nishi*, *supra*, at pp. 967-968.) It is also not required that the victim took the threat seriously, or that the defendant had the present ability to carry out the threat. (*Hamilton, supra,* at p. 936.)

The second type of offense under section 69 is a general intent crime. (*Rasmussen*, *supra*, 189 Cal.App.4th at pp. 1419-1420.) The resistance must include " 'force or violence' " while the officer is lawfully engaged in the performance of his or her duty at the time of the defendant's resistance. (*Id*. at p. 1418.) The only required force is that used by the defendant in resisting the officer from making an arrest, and it does not require that the defendant use force or violence directed toward the person of an executive officer. (*People v. Bernal* (2013) 222 Cal.App.4th 512, 517-520.)

Torres insists that the prosecutor's argument was clearly focused on the second type of section 69 offense, "resisting," with Neifer as the named victim, and without the trial court's alleged erroneous "expansion" of the evidence to include all officers as potential victims from the time Torres finished assaulting Minton and Meeks until he was put into the police car, there was insufficient evidence to support the prosecutor's theory of a section 69 violation. We disagree.

The prosecutor's argument, which initially encompassed the time Neifer was trying to have Torres walk to the police car, and the effort to get Torres into the police car, was based on sufficient evidence of the second type of section 69 violation. The SWAT officers passed Torres over to Neifer and another officer (Neilson) in the hallway. Torres refused to move as directed, and physically pulled away and resisted when Neifer tried to pull him. Neifer and Neilson applied an arm bar and Torres moved down the stairs. When they got Torres to the police car, he refused to get into it. It took the two officers pushing Torres and another officer pulling him from the other side to get him into the police car.

Torres, however, argues that Neifer's testimony fails to establish that Torres actually was resisting. He points out that Neifer testified that Torres was not aggressive when Neifer was taking Torres to the squad car. However, section 69 does not require the defendant to resist aggressively or engage in a certain type of conduct. Instead, the only required force is that used by the defendant in resisting the officer from making an arrest. Section 69 does not require that the defendant use force or violence directed toward the person of an executive officer. (See *People v. Bernal*, *supra*, 222 Cal.App.4th at pp. 517-520.) Here, Torres used force against Neifer and the other officers to resist arrest by trying to get out of the arm bar and also by making it difficult to place him in the police car. Thus, there was substantial evidence to support a violation of section 69 based on the prosecutor's initial argument regarding the second type of section 69 offense and the trial court correctly denied Torres's motion for an acquittal.

30

Because we find substantial evidence supports a violation of section 69 based on Torres's resisting Neifer taking him to the squad car, we need not consider the parties' respective arguments regarding the trial court's expansion of the time frame in denying the motion for acquittal.

### III

### *TORRES'S SENTENCE*

Torres next argues that the trial court abused its discretion when it "fail[ed] to give [Torres's] application for Veterans Court [under section 1170.9] a prudent, discerning consideration[.]" We conclude the court did not abuse its discretion.

### A.  Background

At the sentencing hearing, Torres requested the trial court sentence him to probation with a referral to the Veterans Court under section 1170.9.  This request followed a sentencing brief asking for the same relief, which was supported by various letters and articles advocating that Torres, or an individual like him, be placed on probation and referred to Veterans Court.

At the sentencing hearing, the trial court indicated it had reviewed Torres's sentencing brief and the accompanying documents, the probation report, and a letter from Kevin Gilley.  Included in the documents with the sentencing brief was a forensic psychological evaluation of Torres by Dr. Gregg A. Michel.  Michel produced the report per Torres's trial counsel's request.

31

The probation report indicated that Torres was "presumptively ineligible for a grant of probation, except in the unusual case where the interests of justice would best be served, pursuant to PC1203(e)(3) in that he willfully inflicted great bodily injury in the perpetration of the crime of which he has been convicted. The Probation Officer has reviewed Judicial Council Rule 4.413(c) regarding the unusual case and found none that particularly apply." The probation report recommended a sentence of 10 years four months in prison.

The trial court heard the statements of Adriane Bracciale, Gilley, and Torres in support of placing Torres on probation and referring him to Veterans Court. Bracciale, who was the Equal Justice Works AmeriCorp legal fellow from Veterans Court, advocated that Torres was a good candidate for the Veterans Court because of his "exemplary military record" and "the fact he is suffering from PTSD from combat." The trial court noted that in his evaluation, Michel had found that Torres was not suffering from PTSD or a combat related stress disorder. The trial court also questioned whether the Veterans Court would accept someone like Torres, who had committed "a very serious violent crime" "on repeated occasions." Bracciale assured the trial court Torres was suitable for the Veterans Court program. However, Bracciale admitted that the San Diego Veterans Court had not had any cases where the defendant referred had "multiple counts with multiple great bodily injury allegations against law enforcement officers."

Gilley had known Torres for 11 years and testified that Torres has been bothered by PTSD since leaving the Navy. He believed that Torres would benefit from being referred to the Veterans Court.

Torres then explained to the court how he believed PTSD was impacting his ability to function and deal with life's challenges.

In addition, the court heard the testimony of Minton, who stated that she believed Torres was not remorseful and should be held accountable for his actions.

After hearing argument from counsel, the trial court indicated that it did not believe "a crime this serious should be treated by probationary sentence with a rehabilitation program. It is not for two-strike offenses, two serious assaults with two separate GBI allegations being found by the jury." The court also found, after listening to all the evidence at trial, that Torres did not attack the officers because he was suffering from PTSD. It observed that Torres's version of events was that the officers attacked him first, and he merely defended himself. Prior to sentencing Torres to prison, the trial court summed up its thoughts on the appropriate sentence:

> "In any event, Veterans Court -- I think I said a month ago when we talked about continuing this, this case is not an appropriate case for that type of treatment. So I looked at -- and I -- I'm not a big fan of sending people to prison on their first felony offense. I -- I tend to be lenient. And I really do respect Mr. Torres' service in the military. [¶] But I don't know. Under the circumstances, it's just too serious of a crime involving too many victims on several different occasions. And I got a look at the way the probation department analyzed it, and I'm in agreement that when you look at whether this is an appropriate case for probation, it simply is not."

The trial court then sentenced Torres to prison for nine years four months.

33

B.  Law and Analysis

Section 1170.9 was enacted in 1982 to "offer[] the trial judge a meaningful alternative to either probation or imprisonment in the case of Vietnam veterans convicted of a felony who might otherwise be committed to state prison." (*People v. Bruhn* (1989) 210 Cal.App.3d 1195, 1198.)  It authorized the court, in an appropriate case, to "commit such a defendant for a time period equal to the prison term to a federal facility for treatment for substance abuse or psychological problems resulting from Vietnam combat service." (*Ibid*.)

In 2006, the Legislature found section 1170.9 was "not sufficient to cover returning Iraq and Afghanistan veterans," and therefore amended the section "to extend the opportunity for alternative sentencing to all combat veterans, regardless of where or when those veterans served our country, when those veterans are found by the court to be suffering from PTSD." (Stats. 2006, ch. 788, § 1(d), (e), p. 6289.)  Subdivision (a) of the 2006 version required a mental health assessment of any qualifying veteran convicted of a criminal offense who alleges he or she committed the offense as a result of psychological problems "stemming from service in a combat theater in the United States military."[5]  Subdivision (b) authorized the court to order a defendant who suffers from

---

5    Former subdivision (a) of section 1170.9 provided in full:  "In the case of any person convicted of a criminal offense who would otherwise be sentenced to county jail or state prison and who alleges that he or she committed the offense as a result of post-traumatic stress disorder, substance abuse, or psychological problems stemming from service in a combat theater in the United States military, the court shall, prior to sentencing, hold a hearing to determine whether the defendant was a member of the

34

PTSD, substance abuse, or psychological problems as a result of service in a combat theater and who is "otherwise eligible for probation" and actually placed on probation, "into a local, state, federal, or private nonprofit treatment program for a period not to exceed that which the defendant would have served in state prison or county jail, provided the defendant agrees to participate in the program and the court determines that an appropriate treatment program exists."[6]

Effective January 1, 2011, subdivision (a) of section 1170.9 was amended to extend the availability of a mental health assessment to all military veterans regardless of whether or not they served in a combat theater.[7]  (Stats. 2010, ch. 347, § 1, pp. 1891-

military forces of the United States who served in combat and shall assess whether the defendant suffers from post-traumatic stress disorder, substance abuse, or psychological problems as a result of that service."

[6]     Former subdivision (b) of section 1170.9 provided in full:  "If the court concludes that a defendant convicted of a criminal offense is a person described in subdivision (a), and if the defendant is otherwise eligible for probation and the court places the defendant on probation, the court may order the defendant into a local, state, federal, or private nonprofit treatment program for a period not to exceed that which the defendant would have served in state prison or county jail, provided the defendant agrees to participate in the program and the court determines that an appropriate treatment program exists."

[7]     Subdivision (a) of section 1170.9 now provides:  "In the case of any person convicted of a criminal offense who could otherwise be sentenced to county jail or state prison and who alleges that he or she committed the offense as a result of sexual trauma, traumatic brain injury, post-traumatic stress disorder, substance abuse, or mental health problems stemming from service in the United States military, the court shall, prior to sentencing, make a determination as to whether the defendant was, or currently is, a member of the United States military and whether the defendant may be suffering from sexual trauma, traumatic brain injury, post-traumatic stress disorder, substance abuse, or mental health problems as a result of that service.  The court may request, through existing resources, an assessment to aid in that determination."

35

1892; subd. (b) of § 1170.9 was unchanged by the 2011 amendment.)  Because Torres

committed his crimes in 2011, the requirement pertaining to service in a combat theater is

not applicable to him.

The mandatory nature of subdivision (a) of section 1170.9 reflects the importance

our society places on protecting these individuals.  The court must seriously consider a

defendant's allegations that he or she may qualify for the benefits provided by section

1170.9 and should make every attempt to respect the related process.  Even if probation is

ultimately denied, an assessment conducted pursuant to subdivision (a) will assist the

court in its sentencing determinations.

Disregarding the requirement of service in a combat theater in light of the 2011

amendment to section 1170.9:

> "[T]he following conditions must be satisfied:  (1) the defendant
> must have served [as] a member of the United States Armed Forces;
> (2) the defendant must suffer from [PTSD], substance abuse, or
> psychological problems as a result of that service; (3) the defendant
> must be eligible for probation; (4) the court must place the defendant
> on probation; (5) there must be an appropriate local, state, federal, or
> private nonprofit program that can treat the defendant; and (6) the
> defendant must agree to participate in that program.  If those
> requisites have been met, the trial court then has discretion to order
> the defendant into the treatment program for a period not to exceed
> that which he would have served in prison." (*People v. Ferguson*
> (2011) 194 Cal.App.4th 1070, 1089; italics omitted.)

In this case, the trial court found that the second, third, and fourth conditions were

not satisfied.  Although there appears to be a conflict in the evidence regarding whether

Torres was suffering from PTSD or combat related stress, the court clearly articulated

why it did not believe the existence of such psychological problems played any role in

36

Torres's conduct on the nights in questions. Specifically, the trial court noted that Torres claimed he was attacked by the officers and he just defended himself. Moreover, Torres's own trial testimony casts serious doubt on whether PTSD played any role in his actions on December 15, 2011, unless his version of events was believed:

> "Q: That's what I'm asking you. It [PTSD] doesn't have anything to do with it [fighting the officers on December 15, 2011]. It was the officer, according to your testimony, that started everything, right?
>
> "A: Yes. Yes, sir. Yes, sir.
>
> "Q: Okay. I just want to get that clear. So you're not using it as an excuse, cause you're not excusing anything. You're saying you don't have anything to excuse, right?
>
> "A: I'm saying that P.T.S.D had an effect on my reaction to police officers in my behavior when I -- when I'm attacked. That's -- I don't know if it's excusable, but it definitely has an impact."

In addition, the trial court agreed with the probation report that, by nature of Torres's crimes, he was not eligible for probation and his case did not fall under any exception.

In reviewing the trial court's sentencing decision here, we stress that we employ the differential abuse of discretion standard. (*People v. Superior Court* (*Du*) (1992) 5 Cal.App.4th 822, 831.) " 'An order denying probation will not be reversed in the absence of a clear abuse of discretion. [Citation.] In reviewing the matter on appeal, a trial court is presumed to have acted to achieve legitimate sentencing objectives in the absence of a clear showing the sentencing decision was irrational or arbitrary.' " (*People v. Ferguson*, *supra*, 194 Cal.App.4th at p. 1091.)

37

On the record before us, we are satisfied that the trial court appropriately exercised its discretion. It properly considered the relevant materials before it (including Torres's sentencing brief, Michel's evaluation of Torres, and the probation report), heard testimony from various individuals, and considered argument from counsel. Despite Torres's assertion to the contrary, the court seriously considered Torres's allegation of qualification to probation and the Veterans Court.

That another court may have reached a different conclusion does not demonstrate an abuse of discretion. In reviewing a trial court's denial of probation, " 'it is not our function to substitute our judgment for that of the trial court. Our function is to determine whether the trial court's order granting [or denying] probation is arbitrary or capricious or exceeds the bounds of reason considering all the facts and circumstances.' " (*People v. Weaver* (2007) 149 Cal.App.4th 1301, 1311.) We cannot conclude the court's denial of probation was " 'arbitrary or capricious' " or that it exceeded " 'the bounds of reason.' " (*Ibid.*)

IV

*TORRES'S PITCHESS MOTION*

Torres requests that we review the trial court's ruling on his *Pitchess* motion by independently reviewing the materials the trial court examined in camera to determine if the trial court abused its discretion in denying the motion. The People concede that we have the authority to do so. On our own motion, we augmented the record to include those materials the trial court looked at in camera. After independently reviewing them,

38

we conclude the trial court did not abuse its discretion in denying Torres's *Pitchess* motion.

DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.