[No. A125942. First Dist., Div. Five. Nov. 9, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
JOE RAY RASMUSSEN, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A., and parts II.C. through II.E.

1412

COUNSEL

Diana M. Teran and Frances M. Ternus, under appointments by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Martin S. Kaye and Michael E. Banister, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BRUINIERS, J.**—Appellant Joe Ray Rasmussen was convicted by jury of a felony charge of resisting an executive officer (Pen. Code, § 69),[1] and three misdemeanors—exhibiting a deadly weapon (§ 417, subd. (a)(1)), assaulting a peace officer (§ 241, subd. (c)), and resisting or obstructing a peace officer (§ 148, subd. (a)(1)). Rasmussen was sentenced to three years in state prison on the felony charge and concurrent county jail terms on the misdemeanors. At the time of sentencing, he received credit for 286 days served in jail, plus

---

[1] All subsequent code references are to the Penal Code unless otherwise indicated.

142 days under the then operative version of section 4019, plus 92 days served in a state hospital, for a total of 520 days.

On appeal, Rasmussen seeks our review of the sealed transcript of the trial court's hearing on his pretrial motion for discovery of complaints against the police officers involved in the incident giving rise to the charges against him (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305] (*Pitchess*)). He also contends that (1) the trial court erred in instructing the jury as to the intent required for the crime of resisting an executive officer, (2) the sentences on the misdemeanor convictions must be stayed pursuant to section 654, and (3) he is entitled to additional custody credits based on required retroactive application of 2009 amendments to section 4019.

Having reviewed the transcript of the trial court's hearing on Rasmussen's *Pitchess* motion, we find no error. In addition, we conclude the trial court did not err in instructing the jury. Accordingly, we affirm Rasmussen's convictions.

We conclude, however, that the sentence on one misdemeanor conviction must be stayed under section 654, and we agree Rasmussen is entitled to retroactive application of the amendments to section 4019. In addition, the sentence reflected in the abstract of judgment as to another of the misdemeanor counts is inconsistent with the sentence orally imposed by the trial court. We order modification of Rasmussen's sentence to reflect these changes.

## I. Factual and Procedural Background

### A. *The Evidence at Trial*

On August 7, 2008, Rasmussen entered a Bank of America branch in Arcata. He was carrying a backpack and walked with crutches; his right leg had been amputated below the knee. He spoke with teller Vanessa Carrasco and asked to withdraw money from his safety deposit box, but he did not have a key or a valid box number.

Bank manager A.J. Gonzales attempted to assist Rasmussen, but could not locate any account belonging to him. Rasmussen became agitated. He motioned toward the vault and said he had money there, stated he and "Oprah" owned the bank, and told Gonzales to take him back to the vault. Gonzales refused. Rasmussen became more agitated, frustrated and angry. He swore at Gonzales and threatened to kill him and his staff, saying he had killed other bank managers before. Gonzales, Carrasco, and another bank

employee, Brittany Rogers, testified that Rasmussen raised his crutch as if he were going to use it to strike Gonzales and Carrasco. Gonzales asked Rogers to call the police. Gonzales also told Rasmussen he needed to leave the bank.

Gonzales continued to talk to Rasmussen until police officers entered the bank's east entrance. When Rasmussen saw the police arrive, he picked up his backpack and went out the northwest exit, walking quickly on his crutches. The officers followed him out.

Arcata Police Sergeants Ben Whetstine and Bart Silvers arrived at the bank in response to a report of someone inside the bank threatening to kill people. When the officers entered, they saw Rasmussen on the west side of the bank. Rasmussen began walking away rapidly on his crutches when he saw Whetstine. Whetstine told Rasmussen to stop. When Rasmussen did not stop, Whetstine, followed by Silvers, ran after Rasmussen and followed him out of the bank.

Whetstine caught up with Rasmussen at the corner of Eighth and G Streets and told him to stop. Rasmussen turned around, apparently let go of one of his crutches, and grabbed the other crutch with both hands like a baseball bat. He took a step toward Whetstine as if he were going to swing the crutch at him. Whetstine believed Rasmussen was threatening him with the crutch and was capable of carrying out the threat.

Whetstine stepped back and took out his Taser. Whetstine told Rasmussen he would use the Taser on Rasmussen if he did not put down the crutch. Rasmussen dropped the crutch and sat down.

When Silvers arrived, along with Officer Jorge Sanchez, Rasmussen was crouched down with his knee bent, leaning against a wall and almost sitting on the ground. Whetstine told Rasmussen he would be detained in handcuffs until the police determined what had happened at the bank. Silvers and Sanchez then took hold of Rasmussen's arms in an effort to put his hands behind his back to handcuff him. Sanchez attached a handcuff to Rasmussen's right wrist. However, Rasmussen resisted the officers' efforts to handcuff him; he said something like " 'not behind my back,' " lunged forward, and brought his arms and hands down to his waist in front of him.

Whetstine told Rasmussen he would use the Taser on Rasmussen if he did not stop resisting. Rasmussen did not stop resisting, so Whetstine removed the Taser cartridge (containing the probes) from the Taser and pressed the Taser against one of Rasmussen's shoulders in a procedure known as a "drive stun." Rasmussen reacted by struggling more violently. Still in a crouch, Rasmussen kicked at Whetstine with his good leg, almost hitting Whetstine in

the face with his foot. Rasmussen also got his right arm free and, with the handcuffs still attached to that wrist, began swinging at the officers. Silvers let go of Rasmussen's left arm out of concern he would be hit by Rasmussen's fist and the handcuffs.

The officers again warned Rasmussen to stop resisting, but he continued to thrash. Whetstine put the cartridge back into his Taser and deployed it at Rasmussen. One of the probes hit Rasmussen in the torso. Rather than incapacitating Rasmussen, this only further enraged him. Rasmussen jumped up and, using his residual leg and the wall of the bank for support, continued swinging and punching at the officers; he also swore and yelled at them.

Sanchez then deployed his Taser at Rasmussen; the probes struck Rasmussen's right hand or arm, but did not incapacitate Rasmussen. Rasmussen said, "Is that all you've got?" Rasmussen, without his crutches and using his residual leg, advanced toward Sanchez, moving rapidly, "a lot faster than a walk." Sanchez backed quickly away from Rasmussen. While retreating, Sanchez sprayed pepper spray at Rasmussen, which had no effect. Some of the spray hit Silvers in the eye, and he turned and covered his face out of concern Rasmussen was about to attack him.

Seeing that Silvers was incapacitated by the pepper spray and that Sanchez had both hands full with his deployed Taser and his pepper spray, Whetstine ran up to Rasmussen, got him in a headlock, and threw him to the ground. Rasmussen continued to struggle with Whetstine as they rolled around on the ground, and he continued yelling and cursing. When Whetstine got on top of Rasmussen, Silvers and Sanchez grabbed Rasmussen's arms and handcuffed Rasmussen's hands behind his back. Rasmussen continued physically resisting until he was handcuffed. At that point, Rasmussen and the officers were in the middle of Eighth Street, 10 to 20 feet from the bank.

All three police officers suffered minor scrapes and abrasions, and Silvers had to decontaminate his eye from the pepper spray. Rasmussen had an abrasion above his eye, scrapes on his back, and bleeding and abrasions on his residual leg.

## B. *The Charges, Verdict and Sentence*

As a result of the August 7, 2008 incident, Rasmussen was charged by information with (1) making a criminal threat against bank manager Gonzales (count one; § 422); (2) resisting an executive officer (Sanchez) (count two; § 69); (3) drawing or exhibiting a deadly weapon (his crutch) in a threatening manner, "in the presence of any other person" (count three; § 417,

subd. (a)(1));[2] (4) assaulting a peace officer (Sanchez) (count four; § 241, subd. (c)); and (5) resisting or obstructing a peace officer (Whetstine) (count five; § 148, subd. (a)(1)).

The jury convicted Rasmussen on counts two through five. The jury was unable to reach a verdict as to count one, criminal threats, and the trial court declared a mistrial as to that count.

As noted above, the trial court sentenced Rasmussen to a prison term of three years on the felony charge of resisting an executive officer (count two). As to the three misdemeanors, the trial court imposed county jail terms of six months for exhibiting a deadly weapon (count three), one year for assault on a peace officer (count four), and one year for resisting an officer (count five). The court ordered that the jail terms for the misdemeanors run concurrently with each other and with the prison term on count two. Rasmussen received presentence credit for a total of 520 days.

## II. Discussion

### A. *The* Pitchess *Motion*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B. *The Jury Instructions for Section 69*

Rasmussen contends the trial court erred by instructing the jury that resisting an executive officer under section 69 (count two) is a general intent crime. The People respond that the mental state required depends upon the theory under which the prosecution proceeds. We agree with the People.

Section 69 provides: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in the state prison, or in a county jail not exceeding one year, or by both such fine and imprisonment."

■ The Supreme Court has explained that section 69 "sets forth two separate ways in which an offense can be committed. The first is attempting by threats or violence to deter or prevent an officer from performing a duty

---

[2] Count three did not specify in whose presence Rasmussen allegedly brandished his crutch.

[*]See footnote, *ante*, page 1411.

imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty." (*In re Manuel G.* (1997) 16 Cal.4th 805, 814 [66 Cal.Rptr.2d 701, 941 P.2d 880] (*Manuel G.*), citing *In re M. L. B.* (1980) 110 Cal.App.3d 501, 503 [168 Cal.Rptr. 57]; see also *People v. Hines* (1997) 15 Cal.4th 997, 1061–1062 & fn. 16 [64 Cal.Rptr.2d 594, 938 P.2d 388] (*Hines*) [§ 69 prohibits attempts to deter or prevent an executive officer from performing his or her duty; "[a]nother portion of section 69 also makes it a crime to 'knowingly resist[], by the use of force or violence, [an] officer in the performance of his duty . . .' "].) "The two ways of violating section 69 have been called 'attempting to deter' and 'actually resisting an officer.' " (*People v. Lacefield* (2007) 157 Cal.App.4th 249, 255 [68 Cal.Rptr.3d 508] (*Lacefield*), quoting *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1530 [29 Cal.Rptr.3d 586] (*Lopez*).)

The two types of offenses have different elements. (*Lacefield, supra*, 157 Cal.App.4th at p. 255; *Lopez, supra*, 129 Cal.App.4th at p. 1530.) For example, "[t]he first type of offense can be established by '[a] threat, unaccompanied by any physical force.' ([*Manuel G., supra*,] 16 Cal.4th at p. 814.) It may involve 'attempts to deter *either* an officer's *immediate* performance of a duty imposed by law *or* the officer's performance of such a[] duty at some time *in the future.*' (*Id.* at p. 817[, fn. omitted].) If the threat is to deter the officer's performance of duty at a later time, 'only the future performance of such duty must be lawful,' which means it is unnecessary to decide whether the officer was lawfully performing duty at the time the threat was made. (*Ibid.*) For the second type of offense, the resistance must include 'force or violence,' and the officer had to be lawfully engaged in the performance of duty at the time of the defendant's resistance. (*Id.* at pp. 815–816.)" (*Lacefield, supra*, 157 Cal.App.4th at p. 255.)

Here, count two of the information, tracking the language of the statute, alleged both types of offenses contained within section 69.[3] However, the prosecutor elected to rely on the second type of offense, i.e., actually resisting an officer. When the trial court and counsel discussed jury instructions, defense counsel argued that section 69 was a specific intent crime. The trial court responded by noting the distinction between the two types of offenses in section 69, stating "one phase of it is specific intent and one phase of it is general intent, according to the book. Deterring an officer by threat or violence is specific. Resisting by force or violence is general." The court asked the prosecutor whether she was relying on one or both of the two

---

[3] Count two stated Rasmussen violated section 69 because he "did willfully, unlawfully and feloniously attempt by means of threats or violence to deter or prevent Officer Jorge Sanchez, who was then and there an executive officer, from performing a duty imposed upon such officer by law, or did knowingly resist by the use of force or violence said executive officer in the performance of his or her duty."

theories of culpability. The prosecutor responded: "The second." Defense counsel then asked the court to instruct on both theories, but the court stated it would not do so, because the prosecutor was relying only on the second theory. The court said it would instruct the jury using CALCRIM Nos. 252 (which identified count two as a general intent crime),[4] and 2652 (which covered only the actual resistance theory of § 69).[5]

We conclude the trial court correctly instructed the jury that the resistance prong of section 69, the theory on which the prosecutor relied, was a general intent crime. "When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." (*People v. Hood* (1969) 1 Cal.3d 444, 456–457 [82 Cal.Rptr. 618, 462 P.2d 370] (*Hood*).) The resistance prong of section 69 involves a defendant who "knowingly" resists an executive officer. (§ 69.) "The word 'knowingly' imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code. It does not require any knowledge of the unlawfulness of such act or omission." (§ 7, subd. 5.) "The use of the words knowingly and willfully in a penal statute usually define a general criminal intent. [Citation.] There can be specific intent crimes using the terms but the specific intent in those instances arises not from the words willfully or knowingly, but rather from the requirement in those offenses there be an intent to do a further act or achieve a future consequence. [Citations.]" (*People v. Bell* (1996) 45 Cal.App.4th 1030, 1043 [53 Cal.Rptr.2d 156].)

The definition of the resistance offense in section 69 describes only the act of resisting an executive officer and does not require an intent to do a further act or achieve a future consequence. (See § 69; *Hood, supra*, 1 Cal.3d

---

[4] The version of CALCRIM No. 252 later given by the trial court provided that resisting an executive officer as charged in count two required proof of general intent, and stated: "For you to find a person guilty of these crimes [counts two through five], that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act on purpose, however, it is not required that he or she intend to break the law." The court instructed the jury that count one, criminal threats, was a specific intent crime.

[5] This instruction provided in part: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] One, the defendant unlawfully used force or violence to resist an executive officer; [¶] Two, when the defendant acted, the officer was performing his lawful duty; [¶] AND [¶] Three, when the defendant acted, he knew the executive officer was performing his duty." (CALCRIM No. 2652.) CALCRIM No. 2651 is the separate instruction on trying to prevent an executive officer from performing his/her duty, and includes a specific intent element.

at pp. 456–457.) Accordingly, the resistance offense is a general intent crime. (See *People v. Roberts* (1982) 131 Cal.App.3d Supp. 1, 9 [182 Cal.Rptr. 757] (*Roberts*) [stating "the first part of [section 69] defines a specific intent crime, whereas the second portion constitutes a general intent offense"].)

As Rasmussen notes, courts in several cases have held or assumed that at least the crime described in the first clause of section 69 (the "attempting to deter" offense) is a specific intent crime, requiring proof of a specific intent to interfere with the executive officer's performance of his or her duties. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1153–1154 [124 Cal.Rptr.2d 373, 52 P.3d 572] (*Gutierrez*); *Hines, supra,* 15 Cal.4th at pp. 1060–1061; *In re M. L. B., supra,* 110 Cal.App.3d at p. 503; *People v. Patino* (1979) 95 Cal.App.3d 11, 27 [156 Cal.Rptr. 815] (*Patino*).)[6] Rasmussen points out that the courts in these cases did not distinguish between the two distinct offenses set forth in section 69. For example, in *Patino,* the court did not distinguish between the two clauses of section 69, but stated generally that the crime of obstructing or resisting an officer under section 69 "would appear to require an act done with the specific intent to interfere with the officer's performance of his duties." (*Patino, supra,* 95 Cal.App.3d at p. 27.) In *Gutierrez,* the Supreme Court cited *Patino* without disapproving this language. (*Gutierrez, supra,* 28 Cal.4th at pp. 1153–1154.) However, in both *Gutierrez* and *Patino,* the actions of the defendants were within the scope of the first clause of section 69. (See *Gutierrez, supra,* 28 Cal.4th at pp. 1153–1154 [threat]; *Patino, supra,* 95 Cal.App.3d at pp. 27–28 [same].) As Rasmussen acknowledges, no case has affirmatively stated the second clause of section 69 describes an offense requiring specific intent. (See, e.g., *Gutierrez, supra,* 28 Cal.4th at pp. 1153–1154; *Patino, supra,* 95 Cal.App.3d at pp. 27–28.)

As noted above, the court in *Roberts* did address this issue, stating that, although the first portion of section 69 describes a specific intent crime, the second portion describes a general intent crime. (*Roberts, supra,* 131 Cal.App.3d at p. Supp. 9.) However, the appellant in *Roberts* was charged with resisting arrest in violation of section 148, and the court reached its conclusion about section 69 in order to determine whether section 148 is a general or specific intent crime.[7] (131 Cal.App.3d at pp. Supp. 8–9.) The appellant in *Roberts* contended the crimes described in sections 69 and 148 are in pari materia and, because section 69 had been construed by the *Patino* and *M. L. B.* courts to require specific intent, section 148 also required proof

---

[6] As we have noted, the CALCRIM instructions, relying on *Roberts,* differentiate between the distinct offenses set forth in section 69. CALCRIM No. 2651 provides that preventing or deterring an executive officer from performance of his/her duty requires specific intent.

[7] Section 148, subdivision (a)(1) provides: "Every person who willfully resists, delays, or obstructs any public officer [or] peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished . . . by imprisonment in a county jail not to exceed one year . . . ."

of specific intent. (131 Cal.App.3d at p. Supp. 8.) The *Roberts* court disagreed, emphasizing that section 69 describes two distinct offenses, and distinguishing *Patino* and *M. L. B.* as involving the first type of offense in section 69. (131 Cal.App.3d at pp. Supp. 8–9.) The *Roberts* court concluded section 148, like the second clause of section 69, requires proof of general intent. (131 Cal.App.3d at pp. Supp. 8–9.) The statement in *Roberts* regarding the second clause of section 69 therefore is not the direct holding of the case.

However, for the reasons discussed above, we agree with the *Roberts* court that, under the *Hood* test, the second clause of section 69, which includes only a description of the act of resisting an executive officer and does not refer to an intent to do a further act or achieve a future consequence, describes a general intent crime. (See § 69; *Hood, supra*, 1 Cal.3d at pp. 456–457; *Roberts, supra*, 131 Cal.App.3d at pp. Supp. 8–9.)

■ Rasmussen argues that, if the second clause of section 69 is not construed to require proof of specific intent, it will have the same elements as misdemeanor resisting arrest under section 148, a result Rasmussen contends would be illogical. We reject this argument, as the two offenses do not have identical elements. (*Lacefield, supra*, 157 Cal.App.4th at pp. 256–257.) In *Lacefield*, the court addressed the question whether section 148, subdivision (a)(1), misdemeanor resisting arrest, is a lesser included offense of the second type of offense in section 69. (157 Cal.App.4th at pp. 256–257.) After examining the statutes and the jury instructions listing the elements of the offenses, the *Lacefield* court noted that "[t]here are striking similarities, and some important differences, between the elements of the second type of offense in section 69 and the offense in section 148(a)(1). . . . The section 69 offense specifies unlawful resistance with 'force or violence,' while section 148(a)(1) can be violated without force, since it punishes a person who 'willfully resist[ed], delay[ed], or obstruct[ed].' The section 69 offense requires that the defendant 'knew' the officer was performing his duty, while section 148(a)(1) requires that the defendant 'knew or reasonably should have known' of the officer's role." (*Ibid.*) These different elements are reflected in the CALCRIM instructions for these offenses, which were given to the jury here. (See CALCRIM No. 2652 [§ 69]; CALCRIM No. 2656 [§ 148, subd. (a)].)

In sum, we conclude the trial court correctly instructed the jury that the second type of offense within section 69, resisting an executive officer, is a general intent crime.

C.–E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1411.

## III. Disposition

The judgment is reversed only as to the calculation of presentence custody credits and the modification of Rasmussen's sentence. On remand, the trial court shall revise its sentencing order and the abstract of judgment to reflect that Rasmussen earned an additional 142 days of presentence custody credits pursuant to section 4019, for a total of 662 days. In addition, the sentence for count four must be stayed pending finality of the judgment and service of sentences on counts two, three, and five, such stay to become permanent upon completion of the sentences as to those counts. The amended abstract of judgment prepared by the trial court shall reflect the imposition and stay of the sentence on count four. The abstract of judgment shall also reflect a concurrent sentence of six months, rather than one year, on count three. The trial court is directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

Simons, Acting P. J., and Needham, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 23, 2011, S189073.