Filed 8/29/16  P. v. Olguin CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD OLGUIN,<br><br>    Defendant and Appellant. | B264325<br><br>(Los Angeles County<br>Super. Ct. No. PA080541) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hayden A. Zacky, Judge.  Affirmed.

Susan Morrow Maxwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

At his jury trial for driving under the influence of alcohol (DUI) and refusing to take a chemical test to determine his blood alcohol content (Veh. Code, §§ 23152, subd. (a), 23578), defendant testified the police repeatedly harassed him for no reason. He further testified that he always had a valid driver's license, and that he refused a breathalyzer test because he was frustrated with the arrest process. Over defendant's objection, the court allowed the prosecutor to cross-examine him about his previous DUI convictions and concomitant breathalyzer tests and license suspensions.

Defendant contends the trial court violated Evidence Code sections 1101, subdivision (a) and 352 by allowing the contested cross-examination regarding his prior DUI convictions. We disagree. The trial court acted well within its discretion in permitting the prosecution to ask defendant limited questions about his prior DUI convictions to counter his direct testimony. We accordingly affirm the judgment of the trial court.

## PROCEDURAL HISTORY

An information charged defendant with DUI within ten years of three prior DUI offenses. (Veh. Code, §§ 23152, subd. (a), 23550.) The information further alleged defendant refused to take a chemical test to determine his blood alcohol level. (Veh. Code, § 23578.) Defendant pleaded not guilty and denied the allegation.

After a jury trial, the jury found defendant guilty of DUI and found true the allegation that he refused a chemical test. Defendant subsequently admitted his prior DUI convictions. The court sentenced defendant to the upper term of three years in county jail. (See Veh. Code, § 23550, subd. (a); Pen. Code, § 1170, subds. (h)(1) & (h)(2).)

## FACTUAL BACKGROUND

### A. Prosecution Case

At about 7:30 p.m. on March 29, 2014, Los Angeles Police Department Officer Claudio Gutierrez and his partner, Officer Brittany Callander, were patrolling the Lakeview Terrace/Sylmar area in a police cruiser. That area was part of the Foothill division, to which both officers were assigned. Officer Gutierrez, who had seven years of

2

experience as an officer, was driving. Officer Callander, who had been an officer for approximately two years, was in the front passenger seat.

As he approached the intersection of Eldridge Street and Terra Bella Street, Officer Gutierrez saw a Nissan Altima driving with its headlights off. Officer Gutierrez flashed the police cruiser spotlight at the Altima, "flickered it on and off, on and off quite a few times to get their attention just to notify them hey, your lights are off." When the driver of the Altima turned from Terra Bella onto Elridge without turning on the car's headlights, Officer Gutierrez made a U-turn to follow the Altima and conduct a traffic enforcement stop. The Altima drove for approximately 100 yards before pulling into the driveway of a house and coming to a stop. According to another police officer who later responded to the scene, the occupants of the house did not know "who the folks inside the car were."

Officer Gutierrez pulled the police cruiser behind the Altima, and he and Officer Callander both trained their spotlights on it. Officers Gutierrez and Callander observed three people in the Altima: the driver, a front passenger, and a rear passenger. Officers Gutierrez and Callander both testified that the driver "immediately" exited the car and began acting "belligerent." Officer Gutierrez had never met the driver before the stop, but both he and Officer Callander identified the driver in court as defendant. According to Officer Gutierrez, defendant yelled, "What the fuck do you want?" and yelled and cursed over Officer Gutierrez's instructions to get back into the car. Officer Gutierrez observed that defendant had difficulty maintaining balance and was "crouched over," "swaying," and "flailing his arms." Because the police cruiser's spotlights were illuminating the area, Officer Gutierrez was also able to observe that defendant had a flushed face and glassy, bloodshot eyes. Officer Gutierrez, who had training and experience with DUI and vice investigations, began to suspect at that time that defendant was under the influence of alcohol. He and Officer Callander called for back-up.

Defendant eventually got back into the Altima. When the back-up officers—six or eight of them—arrived, defendant and the other occupants of the vehicle were removed and detained. Officer Gutierrez "personally made contact with the defendant" at that

3

time. During this face-to-face encounter, defendant remained belligerent and uncooperative. Officer Gutierrez "could definitely smell a strong odor of alcohol emitting from him," on his breath. Officer Gutierrez asked one of the additional responding officers, Officer Roberto Martinez, to conduct field sobriety tests on defendant.

Before Martinez could perform the tests, however, a "concerned citizen" directed another of the responding officers, Sergeant Matthew Plugge, to an object lying in the street. According to Officer Gutierrez, the citizen "insinuated," via a tilt of the head, that the object had come from the Altima. Officer Callander recovered the object, a firearm. Officer Callander testified the firearm was lying on Eldridge, in an area the Altima drove past before stopping in the driveway. Defendant and the other occupants of the car were arrested for being in possession of a firearm and transported to the police station.[1]

At around 9:15 p.m., at the police station, Officer Martinez resumed his DUI investigation of defendant. Defendant had not had access to any alcohol since the stop approximately two hours prior. Officer Martinez approached defendant in the holding cell and informed him that he was going to perform some field sobriety tests. During this initial interaction with defendant, Officer Martinez looked at him "to see if he display[ed] any objective symptoms" of intoxication. Officer Martinez testified that defendant did: "he had a slow, deliberate speech, odor of an alcoholic beverage emanating from his breaths, and he was unsteady." Officer Martinez further observed that defendant "had a hard time keeping balance," "was kind of constantly moving like one foot back trying to maintain his balance," and had bloodshot, watery eyes. Officer Martinez formed the opinion that defendant was under the influence of alcohol.

Officer Martinez asked defendant to perform a series of standard field sobriety tests. Defendant only attempted to complete three of the five tests. Officer Martinez found defendant's performance on those tests consistent with intoxication.

---

[1] According to Officer Gutierrez, investigation of the firearm remained pending at the time of trial. Defendant testified that he never was charged with a firearm offense.

4

After he conducted the sobriety tests, Officer Martinez told defendant that he was required under state law to submit to a chemical test to determine the alcohol content of his blood. Defendant refused. Officer Martinez called his supervisor, Sergeant Plugge, and admonished defendant a second time. Defendant again refused to submit to a chemical test.

## B.    Defense Case

Defendant testified that on the date of the incident, he was hanging out with some friends at his house, about a mile and a half away from the intersection of Terra Bella and Eldridge. Defendant drank two 12-ounce beers around 1:00 p.m. and a third around 7:00 p.m.

Sometime between 7:15 and 7:30 p.m., defendant and his friends decided to go get something to eat. Defendant wanted to stop at his friend Ronald's house on the way. While he was driving to Ronald's, defendant passed a police car, which "put a light on" him. The police car did not have its sirens or overhead lights on. Defendant testified that he did not know why the police shined a spotlight at him.[2] He added that the police "know me around there," and that "they've done that many times over with me." On cross-examination, he reiterated, "they've done that in the past for me multiple times in that neighborhood and they didn't stop." Since the police did not put on the siren or ask him to stop, defendant "figured just they were putting it on like they've done in the past; and I just kept driving slow at a normal pace and so did they."

According to defendant, the police did not tell him to pull over; the driveway he pulled into was Ronald's. As defendant got out of the car, he "noticed the officers just stop right in the middle blocking the driveway and they flashed the lights, and at that point they started saying, you know, don't move." Although defendant was angry because he "was just minding my own business," and "had my seat belt on and

_____

[2] Defendant did not know whether his headlights were on or off. According to defendant, "It wasn't dark, and the car has automated light systems. They're on auto. They turn on when it's dark."

everything," he complied with the officers' demands because he "heard something back like a weapon."

Defendant recognized Officers Gutierrez and Callander because they had "harassed" him "in the past." According to defendant, he had "had multiple encounters with a lot of these officers," including "at least three" with Officer Gutierrez. He asked Officers Gutierrez and Callander, "What the fuck's going on now?" because he was upset and "because it seems like every time they see me and I'm driving they pull me over." He continued, "They constantly pull me over, search vehicles, come to the conclusion they don't find anything, and they write me a ticket for driving on a suspended license when I have a current license always. I've always had a valid license."

Defendant testified that after he got back in the car, the officers asked him and his friends to get out. Another of the approximately ten officers who had responded to the scene in the interim detained him when he complied. Defendant stood there, handcuffed, for about 20 to 30 minutes. No one asked him to perform any field sobriety tests.

Eventually, an officer came up to defendant and "started taking off my shoelaces, stuff like that," and explained he was being arrested "for a firearm." Defendant told the officer he had "'no knowledge of any firearm.'" The officers nonetheless transported defendant to the Foothill police station and placed him in a holding cell. Defendant was upset and angry.

At some point, an officer came by and took defendant to a different area of the police station, "where they conduct their DUI sobriety tests." There he met Officer Martinez and Detective Edwards. Defendant was familiar with Detective Edwards, "who handled the two cases where I've been shot." Defendant testified that he had been shot on two separate occasions. On the first occasion, he was shot in the left femur. As a result of that injury, he testified, his left knee sometimes "just gives out on me," and he has to "constantly use my left arm to support myself to get up because I can't apply a lot of pressure on my leg." The second shooting resulted in an injury to his right calf and lower back. On the day he was arrested, defendant also had a diabetic ulcer on his left

6

foot. Defendant told Officer Martinez about all of his injuries and the medications he was taking. Officer Martinez "didn't care or seem to care."

Officer Martinez asked defendant to perform various field sobriety tests. Defendant had a difficult time completing the tests because his injuries left him unsteady on his feet. Defendant also testified that the police had taken away his belt, so he was using one of his hands to hold up his pants. Even after Officer Martinez allowed him to take off his pants, however, defendant could not complete the tests due to his leg injuries. He was "almost falling," and "had to keep grabbing the wall, things like that, to catch" himself.

Defendant admitted that he refused to take a breath or blood test. He testified that he refused because he was "so frustrated with all the tests and I'm explaining to them was [sic] my medical condition and stuff, and they weren't even listening to me or trying to hear me out." He was also frustrated and angry about being arrested for a firearm, and did not understand why sobriety tests were relevant to an alleged firearm offense. Defendant denied that he was given any sort of admonition about the consequences of refusing the tests.

On cross-examination, defendant testified that he had been angry and upset with the police for a long time, since about 1999 or 2000, because of their ongoing and unjust harassment of him. He further testified that he had been pulled over and given a ticket for driving on a suspended license three times, but had a "current driver's license all three times" and got the tickets dropped by producing his license in court. Defendant conceded, however, that his driver's license had been suspended on two occasions since 2009. He also conceded that he had been arrested three times for DUI, that he had given breath samples in all three cases, and that his license was suspended in all three cases. Defendant further testified that "you're supposed to be given a test right on the spot and your license taken away" if your blood alcohol content is over a certain number. Even though he "was not drunk and was arrested for a firearm," he "didn't even think about" potentially being exonerated by a chemical test in this case because the officers already were treating him like he was guilty.

7

On recross-examination, defendant acknowledged his license had been suspended three times and testified that the reason for those suspensions was "DUI."

## DISCUSSION

Defendant argues that the trial court abused its discretion by permitting the prosecution to cross-examine him about his prior DUI convictions. We disagree.

**I. Relevant Proceedings**

Prior to trial, defendant moved to bifurcate trial of his three prior DUI convictions. The court granted the motion, but noted, "[i]f the priors become relevant at any point in time, . . . we can have a 402." The court reiterated this cautionary note after defendant decided he wanted to testify. At that time, the court explained, "depending on how the direct examination goes of Mr. Olguin his prior convictions may become relevant." The court continued, "at this time I can only say that his prior convictions for the three DUI priors, they cannot be used for purposes of impeachment, but they may become subject to direct examination relevant for other purposes."

At the conclusion of defendant's direct examination, the trial court held a sidebar conference at which the prosecutor requested permission to cross-examine defendant about his prior convictions. The prosecutor argued that defendant's prior convictions were relevant to his knowledge, intent, and motive for refusing the chemical test. The prosecutor also argued that the convictions were relevant "to directly refute some of the statements the defendant has put into question himself." Specifically, the prosecutor argued that the prior convictions undermined defendant's claims that he always had a valid driver's license and was unjustly and repeatedly harassed by the police.

The court accepted the latter argument and overruled defendant's objection. It ruled: "I'm going to allow the D.A. to get into this area on cross because I think that the defendant made it relevant by his direct examination in terms of his claiming that he's just harassed by the police for no reason when we all know the reason. . . . In addition in terms of the suspended license, you can get into the fact that he's had his license suspended numerous times since 2009." The court also informed the parties of its intent to give a limiting instruction regarding the priors.

8

Aside from noting that defendant testified he was not read the chemical test advisement, the court did not at that time address the prosecutor's arguments regarding the chemical test. While the prosecutor was cross-examining defendant about the chemical test, and his knowledge of the consequences associated with refusing it, however, the court interjected with a limiting instruction. It told the jury, "Ladies and gentlemen, this area of inquiry [the prosecutor] is making at this point, it's limited just so it may go the defendant's knowledge and credibility only. It's not admitted to show he has a pre-disposition for committing any type of criminal offense whatever, and I'll give you more instruction later. It's being admitted for that limited purpose only."

Prior to the jury instructions conference, "to make sure the record is clear," the court made a lengthy statement of the reasoning behind its ruling concerning defendant's priors. It explained: "I did consider it 352, and I find that the probative value of those brief areas of inquiry were not substantially outweighed by prejudice or confusion of the issues [or] undue consumption of time. The reason I let it in, Mr. Olguin, is because when your attorney was asking you questions you said that the police officers harassed you for no reason; but we know at least on three occasions when you were allegedly harassed it did result in an arrest and a conviction, and it may have been different officers or a different station. I don't know. In addition, you did indicate as well that you always get tickets for suspended licenses, even though you always had a valid license. . . . [W]hen you said that you always had a valid license to me that then became relevant for the D.A. to ask you about the suspended licenses. Lastly, with regard to the prior convictions I believe that the D.A. - - and he articulated this when we were on the record at side bar. He wanted to get out before the jury that another possible reason and motive for you refusing a chemical test this time was because you knew from your past experiences that when you give a chemical test it results in a prosecution and/or conviction; and, in addition, you said on cross-examination when asked about the refusal, you acknowledged the fact that you knew if you blew a blood alcohol level .08 or higher

you would have your license suspended, and that was another reason for not giving the test."[3]

The court later instructed the jury that "certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." (CALCRIM No. 303, "Limited Purpose Evidence in General.") It further instructed: "If you decide that the defendant committed the [other DUI] offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] The defendant knew that taking a chemical test to determine his blood alcohol level, may provide evidence that could be used against him for a prosecution for driving under the influence of alcohol, and/or result in a license suspension; or [¶] As it may bear on the defendant's credibility. [¶] Do not consider this evidence for any other purpose except for the limited purpose of Knowledge and credibility. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] If you conclude the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of [d]riving under the influence of alcohol and refusing a chemical test. The People must still prove the charge beyond a reasonable doubt." (CALCRIM No. 375, "Evidence of Uncharged Offense," modified.)

## II. Governing Principles

Evidence is relevant to a proceeding if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action," or bears on the credibility of a witness or hearsay declarant. (Evid. Code, § 210.)[4] All

---

[3] After the verdict was read and the jury excused, the court clarified its ruling a third time. "I want the record to be perfectly clear. I did not allow those [prior convictions] to come in for classic impeachment because the court is well aware of the law that says a misdemeanor DUI is not a crime of moral turpitude and cannot be used for impeachment. The reason I let the D.A. cross-examine about those subjects was because in my opinion it directly refuted the defendant's testimony on direct examination. That's the reason it came in."

[4] All further statutory references are to the Evidence Code unless otherwise specified.

relevant evidence is admissible unless otherwise provided by a statutory or constitutional provision.  (§ 351; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405.)

Section 1101, subdivision (a) limits the admissibility of relevant evidence of a person's past conduct "when offered to prove his or her conduct on a specified occasion." It "generally prohibits the admission of a prior criminal act against a criminal defendant" for the purpose of showing that he or she acted similarly on the occasion in question. (*People v. Cole* (2004) 33 Cal.4th 1158, 1194.)  "Subdivision (b) of the statute, however, provides that such evidence is admissible 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge . . .).'"  (*Ibid.*)  Section 1101, subdivision (c) further provides that evidence of past conduct is admissible to "support or attack the credibility of a witness."  Thus, under section 1101, "[i]f an uncharged act is relevant to prove some fact other than propensity, the evidence is admissible, subject to a limiting instruction upon request." (*People v. Bryant*, *supra*, 60 Cal.4th at p. 406.)

Even if evidence of a prior offense is relevant to prove something other than propensity and accordingly passes muster under section 1101, "to be admissible such evidence 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352.  [Citations.]'  [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.)  Section 352 vests the court with discretion to exclude otherwise relevant evidence if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

We review the trial court's rulings on the admissibility of evidence under sections 1101 and 352 for abuse of discretion.  (*People v. Bryant*, *supra*, 60 Cal.4th at p. 405.)

### III.    Analysis

Defendant first contends that evidence of his prior DUI convictions and their attendant consequences was not relevant to impeach his claims of police harassment.[5] Because his "claims of harassment were specific to Officers Gutierrez and Callander," he asserts, his priors were irrelevant absent "foundational facts from the prosecution that either Officer Gutierrez or Officer Callander or both had been involved in any of [his] prior DUIs." Defendant takes too narrow a view of his testimony regarding police harassment.

Although he mentioned harassment by Officers Gutierrez and Callander specifically, he also testified that he had "multiple encounters with a lot of these officers." He also claimed he had been unjustly harassed for "a long time," since approximately 1999 or 2000, well before Officers Gutierrez and Callander joined the police force. Defendant further claimed that some of the baseless stops and harassment occurred in areas outside the Foothill division, where Officers Gutierrez and Callander exclusively worked. The trial court was well within its discretion to infer from these broad statements that defendant was claiming unjust harassment by numerous officers. The court thus was equally within its discretion to conclude that defendant's prior DUI convictions were relevant to refute his claims of harassment, regardless of whether Officer Gutierrez or Officer Callander were involved in those prior convictions. Defendant's three prior DUI convictions were relevant to impeach his testimony that he was "constantly" pulled over without cause, and that the police invariably "come to the conclusion they don't find anything" when they pull him over. The convictions tended to show that the police stopped defendant on valid grounds on at least three occasions. The

---

[5] We reject respondent's contention that defendant forfeited this and his other claims by failing to specifically object at trial. Defendant's general objection at sidebar was made in the context of a discussion regarding the admissibility of his prior convictions to challenge his credibility and prove his knowledge and intent. His objection accordingly was "made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought." (*People v. Williams* (1988) 44 Cal.3d 883, 906.)

convictions also were relevant to refute defendant's related testimony that he "always had a valid license" and improperly was issued tickets "for driving on a suspended license."

Defendant next contends that the prior DUI convictions had "little if any probative value" regarding his knowledge of the consequences associated with refusing a breathalyzer test because "[a]ny person of average intelligence knows that a bad blood-alcohol test could lead to incriminating evidence." He relies on *People v. Hendrix* (2013) 214 Cal.App.4th 216 (*Hendrix*), but that case is distinguishable.

In *Hendrix*, the defendant was charged with violating Penal Code section 69, knowingly resisting a police officer's performance of his or her duties by force or violence. (*Hendrix*, *supra*, 214 Cal.App.4th at p. 221.) The defendant's theory of the case was that he did not know the person whom he resisted was a police officer. (*Id.* at pp. 221-222, 237.) The trial court allowed the prosecution to introduce evidence of two prior incidents in which he resisted police officers, ruling that the incidents "'demonstrate that [defendant] has knowledge that he knows what a police officer does in terms of an arrest.'" (*Id.* at p. 225.) The Court of Appeal held this was an abuse of discretion. As is most relevant here, it reasoned that "the police-related knowledge defendant purportedly gained and retained from the 1993 and 2005 incidents is common knowledge. Thus, in a sense, it is cumulative. That, in the course of duty, police officers give verbal commands, use force when trying to arrest a noncompliant individual, and attempt to place an individual's arms behind his or her back for handcuffing, are rudimentary concepts." (*Id.* at p. 244.) The Court of Appeal ultimately reversed the defendant's conviction after concluding that the evidentiary error was not harmless. (See *id.* at pp. 252-253.)

Here, defendant claimed he refused the chemical test because he was frustrated and angry with the police officers. This testimony grew out of his claims of unjust harassment, which we already have explained were subject to refutation by evidence of his prior DUI convictions. Defendant's testimony also placed at issue his motive for refusing the test. It was not an abuse of discretion for the court to allow the prosecution to call that motive into question by suggesting that the real reason defendant refused the

test was that he previously experienced the consequences of a failed test and did not want to repeat them.

Defendant also claimed the officers did not admonish him regarding the consequences of refusing to take a chemical test: "Officer Martinez stated he did, but he never told me anything. He never read me any kind of that admonition paper that you guys saw earlier today. I was never - - I never saw any of that or was told about any of that." He agreed on cross-examination, however, that he nonetheless knew what happened "because it's happened to you on prior occasions." Thus, defendant himself suggested that the consequences of refusing to take a breathalyzer test were not common knowledge. It was not an abuse of discretion for the court to permit the jury to hear about defendant's knowledge of those consequences, gleaned from his prior DUI convictions. As defendant's own testimony suggested, the consequences of refusing a blood-alcohol test are not as "rudimentary" or widely understood as the basic arrest procedures at issue in *Hendrix*. Indeed, one of the elements the prosecution must prove to apply the refusal enhancement is that the defendant was "fully advised" of "the requirement to submit to a test and the consequences of not submitting to a test." (CALCRIM No. 2131.) The prosecution need not prove any such advisement to sustain a conviction under the statute at issue in *Hendrix*. (See CALCRIM No. 2652; *People v. Rasmussen* (2010) 189 Cal.App.4th 1411, 1418.)

Defendant's final contention is that the "overwhelming prejudice" associated with the prior convictions "clearly outweighed [their] probative value." It was not an abuse of discretion for the trial court to conclude otherwise. As defendant acknowledges, his credibility "was critical to his defense." Evidence tending to challenge that credibility, including his prior DUI convictions, accordingly had a high probative value. Any prejudice inherent in the prior convictions (see *People v. Sanchez* (2016) 63 Cal.4th 411, 453) was minimized by the multiple limiting instructions the court gave the jury. "A limiting instruction can ameliorate section 352 prejudice by eliminating the danger the jury could consider the evidence for an improper purpose." (*Hendrix*, *supra*, 214 Cal.App.4th at p. 247.)

14

We have no reason to believe the instructions here did not serve this function. In addition to explicitly instructing the jury not to consider the prior convictions for propensity purposes, they reminded the jury that defendant's prior convictions were "only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of [d]riving under the influence of alcohol and refusing a chemical test. The People must still prove the charge beyond a reasonable doubt." We reject as speculative defendant's suggestion that these limiting instructions were inadequate. "'Any prejudice that the challenged information may have threatened must be deemed to have been prevented by the court's limiting instruction to the jury. We presume that jurors comprehend and accept the court's directions. [Citation.] We can, of course, do nothing else. The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.' [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 866.)

Even if the court abused its discretion in admitting evidence of defendant's prior DUI convictions, any resultant error was harmless. We apply the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818 to determine whether the erroneous admission of evidence resulted in a miscarriage of justice requiring reversal of the judgment. (See *People v. Duarte* (2000) 24 Cal.4th 603, 618-619.) Under the *Watson* standard, an error requires reversal "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

We do not find it reasonably probable that a result more favorable to defendant would have been reached had the prosecution not cross-examined defendant about his prior DUI convictions. The jury heard evidence that defendant, who admitted to drinking before getting behind the wheel of his car, became belligerent with the police officers who pulled him over. Officers Gutierrez and Martinez both testified that defendant exhibited objective symptoms of intoxication, including bloodshot eyes, an unsteady gait, and the odor of alcohol on his breath. Officer Martinez testified that defendant failed all

15

of the field sobriety tests he attempted, and that he refused the blood-alcohol test after being admonished of the consequences of doing so.  On this record, any potential error in admitting defendant's prior convictions was harmless.

## DISPOSITION

The judgment of the trial court is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


EPSTEIN, P. J.


WILLHITE, J.

16